Baird v. SSA                    CV-97-024-B    03/24/98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Barbara Baird

   v.                                    C-97-024-B

John J. Callahan, Ph.D.,
Acting Commissioner,
Social Security Administration


MEMORANDUM AND ORDER

Barbara Baird appeals the decision of the Social Security
Administration (the "SSA") to reject her application for Social
Security Disability Insurance ("SSDI") benefits at step four of
the mandated five-step sequential analysis.  An Administrative
Law Judge ("ALJ") determined that, although Baird suffered from a
number of arthritic ailments, including neck, back, and knee
disorders, she had a residual functional capacity ("RFC")
allowing her to perform sedentary work.  He opined that she could
return to her previous work as a gauger in a ball-bearing plant.
She was, therefore, found not disabled and not entitled to
benefits.  Baird argues, however, that the record lacks
substantial evidence that she could perform her prior work as a

ball-bearing gauger, or any other sedentary work.[1]

For the following reasons, I agree with Baird's contention. Thus, I vacate the SSA's decision and remand the case for further proceedings.

## I.   BACKGROUND

### A.   Limitations Caused by Pain

Baird states that the pain she experiences from her impairments, and particularly from the arthritis in her neck,

---

[1]   Baird also contends that the Social Security Administration ("SSA") erred in determining the onset date of her conditions, resulting in a date one full year later than the claimed date.  Before the SSA's final decision was entered, Baird's attorney pointed out to the SSA that it had erroneously changed the claimed onset date from February 3, 1992, to February 3, 1993 (Tr. at 182), thereby preserving the right to raise the matter on appeal.

Examining the matter, I find that the only documents in the record supporting the 1993 onset date are: (1) the ALJ's decision (Tr. at 17); (2) one of the SSA consulting doctor's reports (Tr. at 78); and (3) one SSA request for Baird's earnings record (Tr. at 122).  All three documents took the February 1993 date from a computerized form (Tr. at 65) prepared by an SSA employee.  The data on the computerized form, however, was taken from information Baird filed on Form SSA-3368-BK (1-89) that alleges an onset date in February 1992.  (Tr. at 92, 96).  In addition, every other document in the record with any bearing on the onset date supports the February 1992 date.  (See, e.g., Tr. at 70, 92, 93, 96, 103, 107, 108, 124, 125-141, 171, and 174).  These include the SSA earnings report (Tr. at 124) and Baird's medical record (Tr. at 125-141), both of which begin in February 1992. (Tr. at 125-161).  Thus, I find that the SSA's entry of a February 1993 onset date was a clerical error and reform the onset date to February 3, 1992.

limits her ability to work as well as to engage in her usual daily living and social activities.

   1.   Limitations at Work

Baird stopped working on February 3, 1992.  (Tr. at 92, 96, 103, 107, 108, and 124).  She had been employed as a catheter inspector at a medical supply company.  (Tr. at 46, 125).  The job required her to sit for seven hours out of an eight-hour day, using a micrometer (a magnifying device) to look for imperfections in catheters.  (Tr. at 46, 111).  To do the work, she had to sit upright at a work bench with her arms raised and out to the sides and with her neck flexed forward, bending her head over the device.  (Tr. at 46).  Holding this position aggravated her arthritis, causing her neck and shoulders to hurt, numbing her left arm, and ultimately making her unable to continue working.  (Tr. at 45).

Baird held only one other job relevant to this appeal, that of a gauger in a ball-bearing plant.  (Tr. at 46, 49, 113).  She inspected the interior and exterior dimensions of bearing parts. Id.  At the ALJ hearing, as well as on her initial benefits application, Baird stated that the job required the same postural position and physical movement as catheter inspection work.  Id. Thus, as a gauger, she had to sit for nearly seven hours a day at

3

an assembly-line bench, with her neck flexed so that her head was bent forward over the gauging device. Id.

2. Limitations with Respect to Daily Living Activities

In addition to the limitations she experienced at work, Baird stated at the hearing, as she had done in her benefits application, that her activities of daily living were altered by her disability. (Tr. at 64-75, 100-106, 114-120). In an early assessment of her daily living capabilities, she stated that she could do light housework (Tr. at 100), qualifying this assessment by stating that she could not mop, vacuum, or carry laundry or shopping bags, and that she had trouble lifting. (Tr. at 65, 101, 105). She even had trouble carrying a gallon of milk. (Tr. at 56).

In later assessments, Baird noted that her condition had worsened and that she could not shop or clean much because of her pain, and that it became harder to walk around stores. (Tr. at 116, 120). Often she rode automated carts at the market, and she planned her trips for times when her family could assist her. (Tr. at 56, 104). Her husband helped with shopping, housework, and cooking. (Tr. at 56, 100, 101, 105). If he did not do so, chores would generally not get done. (Tr. at 104). Often the chores Baird accomplished were limited to sorting and folding the

4

laundry, and even completion of those tasks required frequent breaks. (Tr. at 58).

Further, though Baird could usually wash herself and complete other personal grooming tasks, she sometimes needed help with her shoes and stockings when her knees were exceptionally painful. (Tr. at 104). She walked with the aid of a cane or a walker, and she found that even sitting and standing for any length of time was uncomfortable and that she had to lie down or move about. (Tr. at 53-55, 106). She was unable to stoop or bend over to get items, which she often dropped. (Tr. at 56). Baird stated that even her sleep was affected by the pain. She had to get up in the night to ice her knees for relief. (Tr. at 53, 57).

### 3. Limitations with Respect to Social Activities

Baird also noted how her disability affected her social activities. Although Baird stated that she talked on the phone daily, and either visited her friends using the car or had her friends visit her (Tr. at 101, 102), she qualified these generalities by stating that: her pain was constant so that she often had to get up and move around while chatting (Tr. at 105); her degree of pain and, thus, her ability to make outings were limited by the state of the weather (Tr. at 61, 101); she had to

5

drive to shop or visit friends because her pain prevented her from walking to these destinations as she formerly had done. (Tr. at 105).

Moreover, when Baird tried to read books and magazines, she found it difficult both to sit for long periods of time and to hold books. (Tr. at 105). She had the same problems when doing crafts and other tasks with repetitive movements. (Tr. at 52, 60, 101, 105, 107). Playing a game of cards was difficult too: even when she elevated the playing surface so that she did not have to bend her neck, she could only complete one game before her neck bothered her. (Tr. at 53, 54). She further stated that watching television for long periods of time was uncomfortable, even when sitting in a recliner. (Tr. at 60, 105). Finally, Baird stated that she could no longer bowl, take walks, or engage in other exercise. (Tr. at 60).

## B. **Medical History**

The record contains evidence that Baird suffers from numerous degenerative ailments that have not responded well to a variety of treatments.

### 1. Medical Ailments

The record indicates that after stopping work, Baird visited

her doctors regularly.[2]  Baird consistently complained of pain in her cervical spine to numerous physicians, including Drs. Boule-Bruch, Makman, Ruel, Schlegelmilch, and Thatcher.  (Tr. at 125, 126, 128, 129, 131, 132, 134, 135, 136, 138, 139, 140, 141, 143, 146, 147, 152, 155, 158, 161, 163, 170, 174).  She also complained to these physicians of how the pain in her neck occasionally radiated into her upper back and shoulders, down her arms, and into her hands, and of how movement of these body parts caused pain in her neck.  (Tr. at 125, 126, 129, 131, 136, 138, 139, 140, 143, 147, 152, 158, 163).  X-rays of Baird's neck showed that her neck pain was caused by cervical arthritis.  The x-rays showed disc space narrowing, narrowing of the bony passages through which nerves pass, and other bony growths in her vertebrae.  (Tr. at 123, 126, 127, 128, 130, 140, 169, 170).  Although there was no evident nerve root damage (Tr. at 126, 146), Baird's doctors, including Drs. Boule-Bruch, Schlegelmilch, and Thatcher, attributed her neck pain to her condition and stated that there was no way of providing complete relief. (Tr.

---

[2]  The medical record (Tr. at 125-161) shows only two gaps of at most ten weeks between doctor visits, though some of the visits concerned other medical problems not at issue here.  In almost every entry made in her medical record, Baird complained of some aspect of the arthritic pain in her knees, lower back, feet, hands, shoulder, or neck.

at 129, 131, 135, 136, 139, 170, 172, 174).

In addition to her neck pain, beginning in March 1992, Baird consistently complained of lower back pain. (Tr. at 128, 131, 132, 134, 135, 136, 139, 140, 141, 143, 146, 147, 149, 152, 154, 155, 158, 161, 163, 169, 170, 172, 174). Like her neck pain, Baird's back pain caused transient numbness and pain in her legs and feet. Her doctors attributed her pain to the narrowing of the disc spaces in her lumbar spine as revealed through x-ray examination. (Tr. at 131, 133, 140). Again, Baird's physicians noted that there was nothing they could do about her ailment (Tr. at 131, 174) and that there was no way of completely relieving the pain (Tr. at 131, 132, 134, 136, 154, 163, 170, 172).

Baird's third major complaint was of knee pain. Such pain had been of some concern to Baird before February 1992 (Tr. at 135, 137) but became significantly worse beginning in early 1993. (Tr. at 135, 138, 139, 147, 149, 150, 152, 154, 157, 158, 159, 161, 169). Multiple clinical tests showed crepitance[3] of the knees (Tr. at 135, 138, 139, 147, 158, 159), and x-rays showed a progressively worsening narrowing of the right knee spaces as

---

[3] Crepitance is a noise or vibration produced by rubbing bone or irregular cartilage surfaces together. Stedman's Medical Dictionary 368 (William R. Hensyl et al. eds., Williams & Wilkins 25th ed. 1990).

well as bony growths therein. (Tr. at 135, 137, 140, 150, 151, 160). Eventually, assessments showed there was bone-on-bone contact in Baird's knee. (Tr. at 150). Her doctors stated they would have replaced her knee had Baird been older. (Tr. at 150, 159).

Finally, the record shows Baird had a host of other medical problems. She complained of pain in both her left hip and shoulder, which pain her doctors determined was caused by the onset of bursitis. (Tr. at 141, 143, 153, 154, 155, 156, 158, 161, 169, 170). She continually complained of swelling and redness in her feet that her doctors observed but that they never found a cause of or treatment for. (Tr. at 134, 139, 140, 146). Notes also show that Baird had bony growths on her fingertips and that her arthritis has spread to her hands and the tendon sheaths of her finger joints. (Tr. at 152, 153, 154, 158, 161.

2. Medical Treatments

The medical record shows a variety of recommended treatments and devices including: medications, physical therapy, massage therapy, water exercises, range of movement exercises, avoiding stress on the knees, rest, icing, moist heat, a soft collar, ace bandages or a knee brace, a cane, a walker, lifts, and pain management techniques. Baird complied with many of these

9

treatment recommendations.  Although they were variably effective, in no instance did they reduce her pain below moderate levels.  (Tr. at 128, 132, 139, 140, 150, 153, 154, 159, 169, 171).  For instance, Baird's doctors noted that all attempts at physical therapy[4] failed to relieve her pain.  In addition, Baird's doctors continually tried different medications and dosages in combination with little success at achieving anything more than moderate pain reduction.  The list of medications includes:  Ansaid, Flexeril, Imipramine, Relafen, Elavil, Advil, Tylenol, Nuprin, Voltaren, Feldene, Toradol, Seldane, Xanex, Trilisate, Daypro, Darvocet-N, Zostrix cream, and increasing dosages of Amitriptyline.  The most invasive treatment consisted of steroid injections, which also proved ineffective.  (Tr. at 131, 135, 139, 150, 158-59, 179).  Finally, the doctors noted that either Baird's ailments were inoperable or that it was inadvisable to operate on them.  (Tr. 131, 159).  Thus, commenting on the success of the treatments at alleviating Baird's pain, Dr. Thatcher, and later Dr. Boule-Bruch, opined that Baird had reached a "medical end-point." (Tr. at 135, 174).

---

[4]  Although the record does not contain the reports of any physical therapist, the doctors' notes make frequent mention of Baird's lack of success in the physical therapy, suggesting that such therapy did actually occur.  (Tr. at 126, 128, 129, 131, 140).

10

Because of the pain Baird's arthritis caused her and the lack of successful treatments, her doctors agreed that her arthritis had significant effects on Baird's functionality. For instance, Dr. Thatcher reported in his disability evaluations of Baird that she was between 15 percent and 19 percent disabled (Tr. at 135, 141), although these assessments only accounted for a decrease in the range of movement of her neck and back, not her knees. Also, it is unclear whether pain was a factor in these assessments. The evaluations stress, in particular, Baird's inability to flex her neck forward. Thus, Dr. Thatcher found that Baird should not return to the kind of work she had been engaged in. (Tr. at 129, 131).

Dr. Schlegelmilch also commented on Baird's limited forward neck flexion. In addition, although Dr. Boule-Bruch did find Baird capable of sedentary work (Tr. at 172, 173), Dr. Boule-Bruch severely qualified that assessment. The doctor stated that although she found that Baird could sit for the requisite period of time necessary to do sedentary work, such an assessment assumed the use of a reclining position, not the upright position of bench work. (Tr. at 181). Finally, although the opinion of Dr. Ruel, Baird's neurologist, was limited to whether Baird suffered any nerve damage, about which he commented that there

11

was "a striking paucity of findings" (Tr. at 146), he did observe a numbness in her arms, legs, and feet "of unknown etiology." Id.

C.    **Procedural History**

Baird applied for SSDI benefits on February 28, 1994. (Tr. at 92, 97, 124). The SSA denied the application and the reconsideration request. (Tr. at 70, 85-86). At each stage, the SSA received a different consulting physician's opinion as to Baird's disability. (Tr. at 69, 71-78, 84, 85-86). Each physician based his opinion entirely on the medical record; neither actually examined Baird. Id. They both stated that her impairment did not meet the requirements of a listed impairment, that she could do sedentary work, and that she could, therefore, return to work as a ball-bearing gauger. Id.

Baird requested a hearing before an ALJ to appeal the denial of benefits. (Tr. at 88, 90). The hearing was held on January 25, 1995, and Baird was represented by an attorney. (Tr. at 42-64, 90). The ALJ issued a decision on August 17, 1995. The report contained eight findings and three pages of discussion. The ALJ held that: (1) Baird met the disability insured status requirements; (2) she was not engaged in substantial gainful activity; (3) her impairments consisted of a back disorder and

12

knee problems that did not meet the severity of a listed impairment; (4) her assertions of pain limitations were not credible to the degree alleged; (5) she had an RFC allowing sedentary labor, except that she was not able to stand, walk, or sit for prolonged periods of time, and was restricted to lifting and carrying less than ten pounds; (6) her work as a gauger was not precluded by her RFC; (7) her work as a gauger was not precluded by her impairments; and (8) she was not disabled as defined by the Social Security Act. (Tr. at 17, 18).

The ALJ's discussion illuminated only some of these findings, focusing on how Baird's allegations of pain were not credible and, therefore, on how she could return to work as a ball-bearing gauger. Although the ALJ admitted that Baird's doctors reported she suffered from severe back and neck pain, he found that Baird's medications were successful in relieving most of her pain and discomfort. (Tr. at 15). In addition, the ALJ stated that because Baird's primary doctor said she was capable of sedentary work, but also said she was not capable of resuming her former work, the doctor's opinion was not believable. Also, the ALJ found the doctor's reports did not have substantial evidentiary support because Baird's daily activities were not severely curtailed by her impairments. (Tr. at 16). Citing

13

Baird's activities of daily living questionnaire (Tr. at 100-109), the ALJ found:

> She does not usually have problems caring for her personal needs, e.g., grooming, dressing, cleaning, etc. She is capable of doing light duty cleaning and laundry. She has no problem with concentration. She prepares most of her own meals. She accompanies her husband and helps with the shopping for the household. She is able to drive a car.

(Tr. at 15). Finally, regarding Baird's own account of her disabling pain, the ALJ stated that such allegations were not corroborated by the medical record. He asserted that "her lack of effort to seek appropriate treatment for her pain" and "the types and dosage[s] of any medications taken" indicated that her pain allegations were not credible. (Tr. at 16). Rejecting the evidence of Baird's pain, the ALJ characterized Baird's exertional limitations as being able to sit for six hours of an eight-hour day, with frequent breaks; a capacity within the requirements of sedentary work. (Tr. at 16).

The ALJ then went on to evaluate Baird's past relevant work. He stated that seven hours of sitting with occasional standing, walking, bending, and reaching were required. (Tr. at 16). He concluded, without further support, that given these requirements and her RFC, she could perform the job of a gauger. (Tr. at 16). Because she could return to her prior work as a gauger, Baird was

14

found not disabled.  (Tr. at 17).  In reaching this finding, no vocational testimony was admitted.

After the ALJ denied Baird's claim, she sought review by the Appeals Council.  (Tr. at 8).  The Appeals Council adopted the ALJ's decision as the SSA's final determination.  (Tr. at 4).  On January 14, 1997, Baird filed the present complaint with this court (document no. 1).


## II.  <u>STANDARD OF REVIEW</u>

After a final determination by the SSA, and upon the timely request of a party, this court is authorized to: (1) review the pleadings and the transcript of the record; and (2) enter a judgment affirming, modifying, or reversing the SSA's decision. <u>See</u> 42 U.S.C.A. § 405(g) (West Supp. 1997).  The court's review is limited in scope, however, as the SSA's findings are conclusive if they are supported by substantial evidence. <u>See</u> 42 U.S.C.A. § 405(g); <u>Irlanda Ortiz v. Secretary of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991).  Substantial evidence has been defined as "'more than a mere scintilla,' . . . [and where such exists], even if the record could support multiple conclusions, a court must uphold the [SSA's decision]." <u>Dedis v. Chater</u>, 956 F. Supp. 45, 49 (D. Mass. 1997) (quoting <u>Richardson</u>

15

v. Perales, 402 U.S. 389, 401 (1971)).  Moreover, the SSA is responsible for settling issues of credibility, drawing inferences from the record evidence, and resolving conflicting evidence.  See Irlanda Ortiz, 955 F.2d at 769.  In sum, a court must, uphold the SSA's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the SSA's] conclusion."  Id. (quoting Rodriguez v. Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the SSA has misapplied the law or has failed to provide a fair hearing, however, deference to the decision is not appropriate, and remand for further development of the record may be necessary.  See Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Secretary of Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987).  I review Baird's appeal in light of this standard.

## III.  DISCUSSION

Baird does not dispute that the ALJ correctly followed the first three steps of the five-step analysis required by 20 C.F.R.

§404.1520 (1997).[5] She argues, however, that the ALJ erred at step four of the analysis in finding her able to perform sedentary work and, thus, able to return to her previous work as a ball-bearing gauger. Baird contends that the record lacks substantial evidence to support such a decision. See Santiago v. Secretary of Health & Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). I now examine her contention.

At step four of the required analysis, an ALJ determines whether an impairment would prevent a claimant from performing past relevant work. 20 C.F.R. § 404.1520(e). To do so, the ALJ assesses: (1) the claimant's RFC -- i.e., what she can do despite her impairment; and (2) the demands of any of the claimant's past relevant occupations. See id. If the ALJ finds that the claimant's RFC does not prevent her from doing her past relevant work, then the claimant is held able to work and the claim is denied. Id.; 20 C.F.R. §404.1560(b). In making such findings,

---

[5] An ALJ is required to consider the following five steps to determine if a claimant is disabled: (1) whether the claimant is insured under the Social Security Act and not engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that has lasted or will last for twelve months; (3) whether the impairment meets the severity of those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. 20 C.F.R. § 404.1520.

17

an ALJ must explain in detail how he came to the determination. See Santiago, 944 F.2d at 5-6. This explanation must be based on the record, which includes any hearing testimony. See id.

1. RFC Analysis

In assessing the RFC of the claimant, the ALJ begins by reviewing the available medical evidence. See Manso-Pizarro v. Secretary of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996); Santiago, 944 F.2d at 5. Where the claimant has shown that she suffers from an impairment that could reasonably be expected to produce pain, the ALJ must also consider the claimant's subjective evaluation of the pain and the limitations that the pain may impose. See Avery v. Secretary of Health & Human Servs., 797 F.2d 19, 21 (1st Cir. 1986). An ALJ need not give credence to the claimant's allegations of pain, however, if they are inconsistent with the medical findings regarding her condition. See Dupuis v. Secretary of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989); 20 C.F.R. § 404.1529(a), (c)(4); Social Security Ruling 88-13. Rather, after making specific findings detailing the inconsistencies, the ALJ may discount the claimant's allegations of pain and determine her RFC solely from

the objective medical analysis of her limitations.[6]  See Avery, 797 F.2d at 22-23.

In the instant case, I find substantial evidence exists in the record to support the ALJ's conclusion that Baird was capable of performing sedentary work.[7]  The ALJ began by reviewing the available medical evaluations of Baird's condition.  Although the evidence regarding Baird's ability to perform sedentary work is somewhat contradictory, overall it provides substantial support for the ALJ's finding that Baird has a RFC that would allow her to perform such work.  For instance, Dr. Boule-Bruch, Baird's primary physician, indicated that she had a sedentary work RFC.  Dr. Boule-Bruch found that Baird could sit for the requisite six hours within an eight-hour day, albeit in a reclined rather than an upright position.  In addition, although Dr. Thatcher recommended against Baird returning to the past types of work she

_____

[6]  To determine the credibility of the claimant's allegations of pain, the ALJ must consider: (1) the nature, location, onset, frequency, duration, radiation, and intensity of the pain; (2) any precipitating and aggravating factors; (3) the type, dosage, effectiveness, and adverse side-effects of any pain medications; (4) any non-medication forms of treatment for pain relief; (5) any functional restrictions; and (6) the claimant's daily activities.  See Avery, 797 F.2d at 29.

[7]  Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;" occasional "walking and standing;" and frequent "sitting."  See 20 C.F.R. § 404.1567(a).

had performed, he found her only between 15 and 19 percent disabled.  Finally, the SSA doctors, on whose recommendations the ALJ was entitled to rely, see Berrios Lopez v. Secretary of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991), reached similar conclusions, determining that Baird had the physical strength to perform sedentary work.  Other than a limited ability to walk, stand, crawl, and squat, the SSA doctors found that she had no broad postural limitations that would affect her ability to perform sedentary work.

Next, the ALJ considered Baird's subjective evaluation of her pain and the limitations that the pain imposed on her ability to perform sedentary work.  Again, the evidence in the record provides substantial support for the ALJ's finding that Baird is capable of performing sedentary work.  The ALJ did not make specific findings detailing the inconsistencies between Baird's allegations of pain and other medical evidence upon which he based his opinion, as required by Avery, 797 F.2d at 22-23, though the record does provide such support.  Specifically, Baird's allegations were directly contradicted by: (1) her primary physician's opinion that she had a sedentary RFC; (2) Dr. Thatcher's opinion that she was only between 15 and 19 percent disabled; and (3) the SSA doctors' opinions that noted no pain

20

limitations associated with Baird's ability to perform sedentary work. Further, the ALJ specifically found that her allegations of pain were contradicted by her own account of her daily living and social activity capabilities, including her ability to: (1) do light housework (including sorting and folding laundry, shopping with the aid of an automated cart, and some cooking); (2) wash and groom herself; (3) walk with a cane or walker; and (4) drive. See Ortiz v. Secretary of Health & Human Servs., 890 F.2d 520, 523-24 (1st Cir. 1989).

Although the ALJ did not fully comply with Avery's requirement that he specify how the medical record contradicted the claimant's assertions, see 797 F.2d at 22-23, the record contains more than enough evidence to support his conclusion, and, thus, I must affirm the ALJ's finding that Baird can perform sedentary work. See Irlanda Ortiz, 955 F.2d at 769.

2. Past Work Analysis

After determining the claimant's RFC, the ALJ must next assess the requirements of the claimant's past relevant work and decide whether the claimant can still do that work in light of her RFC. See Santiago, 944 F.2d at 5.

The initial burden is on the claimant to show that she cannot perform her past work. Manso-Pizarro, 76 F.3d at 17;

21

Dudley v. Secretary of Health & Human Servs., 816 F.2d 792, 794 (1st. Cir. 1987). To carry her burden, the claimant must only produce evidence of how her functional limitations preclude her from performing her former work. See Santiago, 944 F.2d at 5. The ALJ must then ascertain the demands of her usual former work and compare those demands with the claimant's capabilities. Id. In making this assessment, the ALJ may rely on the claimant's description of her work duties and her functional limitations, including limitations caused by pain. Id.

The ALJ does not have to accept the claimant's description of her limitations. As noted above, to show that the claimant's claims of functional loss due to pain are not credible, however, the ALJ must make specific findings detailing the inconsistencies he has found between the claimant's assertions of pain and the objective medical evidence or the claimant's own description of her capabilities. See Avery, 797 F.2d at 22-23. In the alternative, the ALJ may rely on the testimony of a vocational expert to show that a claimed limitation due to pain does not preclude the claimant's return to her past relevant work. See Santiago, 944 F.2d at 7; Social Security Ruling 82-62; Social Security Ruling 82-61. Once the claimant has raised a contention that her limitations prevent her return to her former work, an

22

expert evaluation is ordinarily essential to refute her contentions unless the extent of the claimant's functional loss and its effect on her work capabilities would be apparent even to a lay person.  Santiago, 944 F.2d at 7.

Hence, at step four, where the claimant makes a prima facie case that she cannot return to work, and the ALJ does not properly explain why her claims of pain are incredible, or the ALJ has no expert testimony that the claimant can return to her work despite the pain limitations, the claimant must prevail at step four.  See Manso-Pizarro, 76 F.3d at 18-19.

Here, Baird successfully made her prima facie case that she could not return to her past work, including her work as a ball-bearing gauger -- the only occupation at issue in this case.  She testified at the hearing, as she had stated in her benefits application, that her neck condition and the pain it produced rendered it impossible for her to meet the postural demands of both catheter inspection work and ball-bearing gauger work.  Moreover, she testified that the postural demands of both jobs, specifically neck flexion, were the same.  There is no record evidence to counter this contention as the SSA introduced no vocational expert testimony.  Baird supported her assertion that she could not return to work as a gauger with considerable

23

medical evidence as well as with her own description of how her pain has inhibited her daily living and social activities in ways similar to the way in which it limits her ability to work as a gauger.

After receiving such evidence, the ALJ concluded that Baird could not return to work as a catheter inspector, but that she could return to work as a ball-bearing gauger.[8] In reaching this conclusion, the ALJ found the evidence in support of Baird's claim regarding her inability to resume work as a gauger was not credible because it was contradicted by other record evidence. I find, however, that a reasonable mind reviewing the evidence in the record could not accept that it lends any support to the ALJ's conclusion. Thus, the ALJ's conclusion as to Baird's returning to work as a gauger cannot stand on the present record.

---

[8] This distinction by itself reveals a fatal inconsistency in the ALJ's decision. Without any testimony distinguishing the jobs, and in the face of evidence likening them, the ALJ stated that Baird's condition precluded her from returning to one job but not the other. To reach such a conclusion, the ALJ either: (1) accepted Baird's account of how her pain precluded her from working as a catheter inspector while impermissibly ignoring her just-as-well-supported account of how her pain precluded her from working as a gauger; or (2) impermissibly relied on the SSA's initial benefits determination that made a similar distinction between the two jobs without the benefit of Baird's hearing testimony. In either case, the ALJ abused his power in that he did not properly consider Baird's allegations of how her pain limited her ability to work as a gauger.

24

In rendering this decision, I look in turn to the ALJ's analysis of the medical evidence and Baird's description of her daily living and social activities.

(a)  The medical record

The medical record reveals that Baird suffers continuous pain due to arthritis of the cervical spine.  Her arthritis results from the vertebral discs, the vertebrae themselves, and other bony growths within the cervical spine exerting pressure on nerves as they pass through that portion of the cervical spine. The record reveals that Baird's physicians were unable to provide her with anything more than partial relief from her pain. Despite physical therapy and courses of numerous types of pain medications, Baird's neck pain never subsided below moderate levels.  In addition, her physicians stated that her condition is not amenable to surgery.  Consequently, Baird's physicians stated that they have reached a "medical end-point" in trying to eliminate her pain.

Moreover, the medical record reveals that the permanent pain Baird experiences in her neck limits her ability to perform her past work as a gauger.  Both disability assessments conducted by Dr. Thatcher stress Baird's inability to flex her neck forward, a movement necessary when sitting upright and studying materials

25

located on a laboratory tabletop. Consequently, Dr. Thatcher recommended against Baird returning to such work, a restriction that implicitly includes her work as a gauger in that it requires sitting upright and bending one's neck forward to study materials located on a tabletop. Dr. Boule-Bruch also found that Baird's condition would prevent her from performing any sedentary work that required her to bend her neck forward. Further, Dr. Schlegelmilch commented on Baird's limited forward neck flexion. Thus, the medical record contains substantial evidence that Baird's condition would prevent her from returning to work as a gauger.

Yet, the ALJ discounted such evidence as incredible, finding that it was contradicted by other evidence in the record. If I find substantial support exists for the ALJ's conclusion, I must accept it. Baird's medical evidence, however, is simply not contradicted in the way the ALJ claimed it was.

To support his conclusion that Baird's neck pain would not preclude her returning to work as a gauger, the ALJ stated that Baird's medications successfully relieved most of her pain. Nowhere in the extensive medical record, however, is there any evidence that Baird's pain ever dropped below a moderate level. All of Baird's physicians stated that hers was a permanent

26

condition and that a reduction of pain to a moderate level was the best they could attain. Baird's neurologist's statement that Baird's nervous system was intact and that her pain had an unknown etiology in no way supports the ALJ's conclusion that Baird's pain was controlled or non-existent. That Baird's pain medications were continually changed over the course of a two-year period shows quite the opposite and corroborates her doctors' opinion that, at best, her pain was only cut to moderate levels and could never be completely controlled.

The ALJ also found Baird's allegations of pain contradicted by her lack of effort to obtain treatment. Yet, this finding, too, is unsubstantiated by the record. Throughout her treatment history, the record shows that Baird complied with her treating physicians' advice, including trying numerous medications; medications involving injections; and wearing a cervical collar. She even considered having invasive measures performed against the advice of her doctors. In sum, she did everything possible to obtain all appropriate treatment. Nowhere does the ALJ point to contradicting evidence.

Finally, the fact that Baird's physicians found her able to do sedentary work but not able to work as a gauger provides no support for the ALJ's conclusion that she could work as a gauger.

27

The physicians' comments regarding Baird's sedentary work capabilities do not contradict their statements that Baird's capabilities prevent her from working as a gauger. The physicians always qualified their comments about Baird's sedentary work capabilities by stating that she could not perform jobs requiring neck flexion.

I cannot accept that a reasonable mind reviewing such evidence would find that it lends any support to the ALJ's discounting of the medical evidence that Baird's neck pain prevents her from returning to work as a gauger. Therefore, such discounting of Baird's medical evidence was in error.

(b) <u>Baird's description of her daily living and social activities</u>

Baird's description of how her pain limits her daily living and social activities substantially corroborates her claim that her pain limits her ability to work as a gauger. Regarding her daily living activities, Baird stated that she can no longer perform household chores that place stress on her neck, such as carrying groceries or laundry, and vacuuming or mopping. Even in doing jobs that place minimal stress on her neck, such as sorting or folding laundry, Baird testified that she has to take multiple breaks. In addition, she testified how her social activities were also limited by her pain in a way similar to how her work

28

capabilities were limited. Baird spoke of how she finds it difficult to hold up books or magazines; do crafts that require repetitive motions; play a game of cards without elevating the playing surface so that she does not have to bend her neck at all; or watch television even when reclining.

Yet, as with Baird's medical evidence, the ALJ also discounted this evidence as incredible, finding that it was contradicted by other evidence in the record. Again, if I find substantial support exists for the ALJ's conclusion, I must accept it. Baird's description of how her pain limits her activities, however, is not contradicted in the way the ALJ set forth in his opinion.

To support his conclusion that Baird's daily living activities were not affected by her pain to the extent she claimed, the ALJ cited portions of Baird's daily living questionnaire wherein she describes how she: can groom and dress herself; do light cleaning, laundry, and cooking; shop; and drive a car. Yet, the ALJ ignored Baird's hearing testimony through which she qualified such generalizations and explained how they do not contradict her allegations of pain. At the hearing, Baird testified, for example, that: she can groom and dress herself but often needs help with actions such as pulling up her stockings;

29

her laundry tasks are limited to sorting and folding, chores accomplished only with frequent breaks; her shopping is done in an automated cart and with the assistance of her husband; and her driving was out of necessity -- i.e., for short distances to replace walks of the same length that had become too painful.

When discounting Baird's comments about her social activities, the ALJ also ignored evidence that reconciles Baird's general comments about her activities with the particularities of how her pain limits her activities in ways similar to the way in which it limits her ability to work as a gauger. In discounting Baird's evidence, the ALJ relied solely on her statements that she still drives a car to shop and visit friends. He overlooked the fact that Baird finds it extremely difficult to hold a book up, play cards, do crafts, or watch television comfortably because of the demands these activities place on her neck.

Again, I cannot accept that a reasonable mind reviewing such evidence would find that it lends any support to the ALJ's conclusion, and, thus, I find that his discounting of Baird's description of how her pain limits her activities was in error.

Baird has borne her burden of proof that her functional limitations preclude her from doing her former work, including her work as a gauger. The ALJ's conclusion to the contrary finds

30

no support in the record.  Thus, I must vacate the decision and remand the case for analysis at the step-five stage of disability benefits review.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Baird's motion for summary judgment requesting reversal of the SSA's decision (document no. 5) is granted, and the SSA's motion to affirm (document no. 8) is denied.  Pursuant to 42 U.S.C.A. § 405(g), the ALJ's decision is vacated, and this case is remanded for further proceedings. Judgment shall be entered for the petitioner accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge


March 24, 1998

cc:  Michael Kainen, Esq.
     Maria L. Sozio, Esq.
     David Broderick, AUSA

31